IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CARLOS TOVAR MENDOZA,

       Petitioner,

v.                                                       CIV 05-1303 BB/CEG

ANTHONY ROMERO, Director,
Regional Correctional Center, and
GARY KING, Attorney General
for the State of New Mexico,

       Respondents.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

       This matter is before me on Petitioner Carlos Tovar Mendoza's (Tovar) § 2254 petition for habeas corpus. On April 1, 2008 and April 2, 2008, the Court held an evidentiary hearing. The evidentiary hearing focused on two issues: (i) whether Tovar's attorney was ineffective for failing to investigate the rape charge, and (ii) whether Tovar's plea was involuntary due to certain promises made by his attorney. For the reasons below, I find that his plea was involuntary as a result of ineffective assistance of counsel and is a "constitutionally inadequate basis for imprisonment." *Blackledge v. Allison*, 431 U.S. 63, 75 (1977). As such, I recommend that the habeas petition be granted.

## I. Background

A. Procedural Background

       On October 18, 2002, while on supervised release for a federal crime, a grand jury in Bernalillo County, New Mexico indicted Tovar for first degree kidnaping, second degree

criminal sexual penetration (CSP), and aggravated battery against a household member.[1]  *See CRCR 02-3530 Record Proper (RP)* at 1-2.  The alleged victim was Tovar's ex-wife, Lilia Tovar (Lilia).  On December 3, 2002, Matthew Torres entered his appearance.  *Id*. at 13.  Tovar, however, became unhappy with Mr. Torres's representation and, upon his request, his family hired Anthony Ayala.  *See Evidentiary Hearing Transcript Volume I (TR I)* at 21, 168.  Mr. Ayala entered his appearance on February 25, 2003.  *See RP* at 24.

On March 25, 2003, less than twelve days after Mr. Ayala received a plea offer letter from the State, Tovar appeared before Judge Albert S. Murdoch to enter a plea of no contest. *See Doc. 91, Exs. 19, 34*.  Despite Mr. Ayala's insistent and repeated attempts to enter the plea, the assistant district attorney was not prepared to go forward with a no contest plea without first consulting with his supervisor and the alleged victim.[2]  *Id*.  Three weeks later, on April 14, 2003, Tovar signed a Repeat Offender Plea and Disposition Agreement.  *See RP* at 40-45.  Under the terms of the plea agreement, he pled no contest to second degree kidnaping, second degree CSP, and third degree aggravated battery.  These charges related to an incident occurring on October

---

[1] Regarding the federal crime, Tovar was convicted of Conspiracy to Violate 21 U.S.C. § 841(b)(1)(D) and Possession With Intent to Distribute less than 50 Kilograms of Marijuana.  He was sentenced to 46 months and three years supervised release on April 28, 2000.  *See 99 CR 690*, *Doc. 101*.

[2] The following exchange took place at the March 25, 2003 plea hearing:
>MR. AYALA: Your honor, we're ready.
>THE COURT: I know you're ready, and you keep saying that, Anthony, but it doesn't do any good, for me, for you to say that, does it?  Don't say anything.  It doesn't do me any good to hear that because I can't tell [the State] to accept a no contest, can I?
>MR. AYALA: Well you – we could talk about this before we let my client go and we've got it together, before --
>THE COURT: What he's saying is, he needs to pass it by his supervisor and his alleged victim before he will even talk about it, so pulling him aside today and saying "Let's talk about it" is not going to put him in a different position, is it?
>MR. AYALA: I'd just like to resolve it.

*Doc. 91, Ex. 34* at 3.

8, 2002.  *Id*. at 40-41.  He also pled no contest to second degree CSP.  This charge related to an incident occurring on September 4, 2002, and was filed by way of information on April 11, 2003.[3]  *Id*.  Under the plea agreement, Tovar faced a potential incarceration of up to thirty years.  *Id*. at 42.

At the April 14, 2003 plea hearing, Judge Murdoch reiterated the terms of the plea agreement.  *See Doc. 91, Ex. 6*.  He told Tovar that "the bottom line is, I can sentence you anywhere from 0 to 30 years in prison."  *Id.* at 4.  Tovar, with the help of an interpreter, stated that he understood, that no one had promised him anything that was not contained in the plea agreement, that the plea agreement had been interpreted for him, that no one had forced him to enter the plea, that he was entering the plea under his own free will, and that he was satisfied that the agreement was in his best interest.  *Id.* at 4, 8-10.  When Judge Murdoch told the assistant district attorney that he "absolutely" wanted a factual basis, Mr. Ayala jumped in and stated: "we'll stipulate that there is a factual basis, Your Honor."[4]  Thus, Judge Murdoch did not require one.  *Id*.

On July 1, 2003, Tovar appeared before Judge Murdoch for sentencing.  *See Doc. 91, Ex. 6*.  At sentencing, Lilia testified that on the evening of October 8, 2002, Tovar battered her and

---

[3] *See CRCR 03-1063 Record Proper* at 1-2.

[4] The full factual basis exchange went as follows:
    MR. BENFORD: I don't know if the Court wants a --
    THE COURT: A factual basis is what I want, absolutely.
    MR. AYALA: We'll stipulate that there is a factual basis, Your Honor.
    THE COURT: All right.  You've gone over the statements of the alleged victim and the law enforcement officers, and you are satisfied that if this case went to trial, a reasonable jury could find your client guilty of these allegations?
    MR. AYALA: Yes.
*Doc. 91, Ex. 6* at 11.  At the evidentiary hearing, the prosecutor testified that "I started to talk and to give the judge a factual basis, and then Mr. Ayala jumped in – well, the transcript speaks for itself, I guess."  *TR II* at 89.

3

took her, against her will, to an area near the river where he raped her in the back seat of her car.

*Id*. at 3-4.  After hearing from Tovar's mother and a substance abuse counselor, Tovar, through

an interpreter, told Judge Murdoch:

>    THE DEFENDANT: I would like to say that there's
> confusion with all of this that is happening.  She's contradicting
> herself with some of the things she says . . . .  My children saw me
> sleeping in the house for three days, and the neighbor, so it's not
> possible that I raped her, because previously we had a relationship
> together.  What happened was there was a friend in my apartment–
>    THE COURT: Wait, wait, wait.  You think if you had a
> prior relationship with her you couldn't rape her?
>    THE DEFENDANT:  Yes.  Before that, she would be
> willing to be together with me and have relationship, two --the two
> of us.
>    THE COURT: But this time she wasn't, and this time she
> didn't want to.
>    THE DEFENDANT: This time I didn't do anything.
>    THE COURT: So you didn't do anything of -- any of this?
> You feel no remorse, and everybody here is picking on you?
>    THE DEFENDANT: No.  Nobody's picking on me.  I
> asked God to bless my children and bless my wife, and to bless my
> mother, and to bless the Judge and the lawyer, and for God to bless
> me.  That's what I wrote in the presentence report to you.

*Id*. at 12-13.  Following this exchange, Judge Murdoch did not allow Tovar to speak further and

sentenced him to twenty-five years in prison, followed by five years of supervised probation.[5]

*Id.* at 13-15.  The evaluation section of Tovar's presentence report provides: "In the present

offense, the defendant states that he did not kidnap or sexually penetrate the victim.  He claims

that the victim lied; he stated, 'she knows what happened.'"  *Doc. 37, Ex. 6* at 3; *see also TR II* at

155.

---

[5] Specifically, Judge Murdoch stated:
> I can see very little reason to extend to you much mercy today.  You haven't
> said that you were sorry, you haven't said that what you did was wrong, and
> you're not prepared to admit that you treated her in a way you shouldn't have
> treated her – you've already spoken.  You will not speak again.

*Doc. 91, Ex. 6* at 14.

The plea agreement waived Tovar's right to file an appeal, but Mr. Ayala did file a motion to reconsider sentence. *See RP* at 53-54. In the motion, Mr. Ayala asserted, without specification, that Tovar had "additional mitigating circumstances to bring to the Courts [*sic*] attention." *Id*. Judge Murdoch denied the motion and, thereafter, Mr. Ayala was no longer involved in the case. *Id*. at 56.

On December 15, 2003, approximately five and a half months after sentencing, Tovar filed a pro se state petition seeking habeas relief on a number of grounds that he grouped under two headings: "involuntary and unknowing plea" and "ineffective assistance of counsel." *RP* at 72-112. These are the same claims that Tovar brings in his petition for writ of habeas corpus under 28 U.S.C. § 2254. *See Docs. 1, 37, 38*. Regarding the ineffective assistance of counsel claim, Tovar alleges that his attorney failed to investigate obvious inconsistencies that would have proved his ex-wife had lied about being raped. *Id*. As for his plea claim, he contends that his attorney promised him he would receive a three-year sentence. *Id*. Tovar does not allege that his attorney made an erroneous sentence prediction, but rather, that his attorney insisted that he had a side agreement with the judge. *Id*. He alleges that he was never read his plea transcript in Spanish and that his attorney first showed it to him in Court while he was sitting in the jury box. *Id*.

Five months after filing the state petition, Tovar filed a motion to compel the State to respond. *See RP* at 113-115. Judge Murdoch granted the motion and, in accordance with NMRA Rule 5-802(E)(2), counsel was appointed to represent Tovar. *RP* at 116-19. Eight months after Judge Murdoch ordered the State to respond, Tovar's petition was dismissed summarily without an evidentiary hearing, despite the State's failure to respond. *RP* at 123-124. In its entirety, the opinion states: "The Petitioner freely and voluntarily entered this plea with full

knowledge of the consequences. The Court, as reflected in the transcript, clearly established that Mr. Tovar understood and wanted the agreement." *RP* at 124.

Tovar then, with the help of his appointed counsel, petitioned the New Mexico Supreme Court for certiorari. Counsel raised a single issue: "Whether the district court must hold an evidentiary hearing when a prisoner's pro se habeas petition raises factual allegations about promises made by his attorney outside the record of the plea proceedings and he alleges that his pleas [*sic*] was not voluntarily or knowingly made, and he claims ineffective assistance of counsel." *Doc. 13, Ex. E*. On November 15, 2005, the New Mexico Supreme Court denied Tovar's petition for certiorari in a form order.[6]

On December 14, 2005, Tovar filed his § 2254 petition in this Court. *See Doc. 1*. On February 13, 2006, Respondents filed a motion to dismiss. *See Docs. 11-12*. I filed my initial proposed findings and recommended disposition on December 8, 2006, which recommended that Tovar's petition be dismissed with prejudice. *See Doc. 31*. After reviewing Tovar's objections, however, I issued an amended proposed findings and recommended disposition, recommending that an evidentiary hearing be conducted. *See Doc. 39*. Respondents timely filed an objection to my recommendation, asserting, among other things, that Tovar had not cleared the "initial hurdle" of 28 U.S.C. § 2254(e). *Doc. 43* at 2. On April 16, 2007, Judge Black issued an order adopting my recommendation. *See Doc. 44*. In the Order, the Court found that 28 U.S.C. §

---

[6] In its entirety, the New Mexico Supreme Court decision states:
> This matter coming on for consideration by the court upon Petition for Writ of Certiorari filed pursuant to Rule 12-501 of the Rules of Appellate Procedure, and the Court having considered said petition and response, and being sufficiently advised, Chief Justice Richard C. Bosson, Justice Pamela B. Minzner, Justice Patricio M. Serna, Justice Petra Jimenez Maes, and Justice Edward L. Chavez concurring; Now, Therefore, It is Ordered that the Petition for Writ of Certiorari is denied.

*Doc. 12, Ex H*.

6

2254(e)(2) was not applicable because Tovar had "diligently attempted to develop the factual basis for his claims in accordance with New Mexico law." *Id.* at 3. The Court also concluded that Tovar was entitled to an evidentiary hearing on his failure to investigate claim and his plea claim. *Id* at 3-6.

On April 1, 2008 and April 2, 2008, I presided over the evidentiary hearing. *See Doc. 94*. The Court heard testimony from eleven witnesses, including Tovar, the assistant district attorneys involved in the case, and three members of Tovar's family. *Id*. Mr. Ayala did not testify and, at the conclusion of the evidentiary hearing, I expressed concern that Respondents had not called Mr. Ayala. *TR II* at 162. Respondents' counsel stated:

> Your Honor, I do know the claim is made against Mr. Ayala. I did alert him to the evidentiary hearing. Number one, I think it's the burden of the petitioner to bring forward Mr. Ayala and to present any evidence. Number two, as soon as I knew this hearing was on, I had made daily phone calls at Mr. Ayala's current phone number that is reported in the state bar directory, and again Mr. Ortega, who is here right now, I sent him on Monday, March 31st, to the actual address for Mr. Ayala, and he did not see Mr. Ayala. So attempts have been made repeatedly to secure Mr. Ayala's attendance.

*Id.* at 162-63.

B. Factual Background

Tovar first met Lilia in Chihuahua, Mexico when he was sixteen or seventeen. *See TR I* at 146. The two moved to Albuquerque and married in 1987. *Id*. at 147. They had three children together. *Id*. at 150. In 1999, while Tovar was serving his federal sentence for possession of marijuana, Lilia filed for divorce. *Id*. at 20, 47, 147. In July of 2002, Tovar was released from prison and moved back to Albuquerque. *Id*. at 19, 34, 59. He resided at his mother's apartment, which was located at 3815 Montgomery Boulevard. *Id*. In the summer and

fall of 2002, Tovar maintained an intimate relationship with Lilia and spent a substantial amount of time with his three children.  *See TR I* at 20, 34-35, 48, 59-60, 71, 148-150.  He had a key to Lilia's house and would, on occasion, work there building furniture.  *TR I* at 151-52.

> i.  The October 8, 2002 Charges

At around 11:30 pm on October 8, 2002, Lilia's neighbor, Mark Bruening (Bruening), heard screaming in the street outside his house.  *See Doc. 91, Ex. 11*.  Bruening went outside and saw Tovar fighting with someone in Lilia's red Pontiac, but he could not make out who the other person in the red Pontiac was.  *Id*.  When Lilia had not returned to her house by the next morning, Bruening and another friend went to Tovar's apartment on Montgomery Boulevard.  *Id*.  Seeing blood inside Lilia's car, they called the police.  *Id*.; *see also Doc. 95, Ex. 6*.  The police arrived at Tovar's apartment and, after viewing blood on items inside Lilia's car, entered the apartment and arrested Tovar.  *Id*.  Lilia, who had been beaten badly, was taken to the hospital.  *Id*.

On October 9, 2002, the police interviewed Lilia at the hospital.  *Doc. 91, Ex. 11*.  In a taped statement, she explained that, while she was in her car, Tovar walked up to her, pushed her, and removed her car keys.  *Id*.  He then got into her vehicle and began beating her.  *Id*.  She said that Tovar accused her of sleeping with another man and that he took her, against her will, to an area near the river.  *Id*.  He continued to beat her and she jumped into the river.  *Id*.  She stated that Tovar eventually helped her out of the water and he took her back to his mother's apartment.  *Id*.  During this interview, Lilia did not state that Tovar had raped her.  *Id*.  The hospital records do not indicate that Lilia reported being raped.  *See Doc. 95*, *Ex. 4; TR II* at 142.  Before the grand jury proceeding on October 18, 2002, Lilia informed the lead prosecutor that she had been sexually assaulted in the back seat of her car by Tovar on the evening of October 8,

2002. *See TR II* at 143-144. In this proceeding, Tovar admits battering Lilia on the evening of October 8, 2002. *See Doc. 38*; *TR I* at 179-80. In line with his statements in the presentence report and to Judge Murdoch at sentencing, he, however, denies raping Lilia. *Id.*; *See Doc. 91, Ex. 6* at 13; *Doc. 37, Ex. 6* at 3.

Eleven samples were taken from the back seat of Lilia's car. *See Doc. 95, Exs. 6.*; *Doc. 91, Ex. 14*. These samples were submitted for both serological and DNA testing. The serology report, which was completed on March 31, 2003, tested negative for the presence of blood. *Id.*; *TR II* at 107. DNA testing was stopped once the State learned that Tovar had agreed to enter a plea.[7] *TR II* at 13-14. Pursuant to Tovar's Motion for Independent Analysis in this proceeding, DNA testing resumed in 2007. *See Doc. 63*. The biology report, dated November 7, 2007, concludes that, of the eleven samples, Tovar cannot be excluded as the donor of the sperm portion of five samples. *See Doc. 91, Ex. 20*.

ii. The September 4, 2002 Charge

On the evening of September 4, 2002, Lilia went to the hospital and reported being raped by her ex-husband earlier that day. *See Doc. 95, Ex. 5*. She was interviewed by hospital staff and a Sexual Assault Nurse's Examination was conducted. *Id*. The medical records do not indicate any type of trauma or injury to Lilia. *Id*. Lilia was advised to contact law enforcement if the crime was to be investigated. *Id*. No police report was ever filed regarding the September incident. *Doc. 91, Ex. 19*; *TR II* at 66. Although it is unclear from the record when Lilia reported the September incident to prosecutors, it was sometime before the March 13, 2003 plea offer letter to Mr. Ayala, and, presumably, after the October 18, 2002 grand jury proceedings.

---

[7] Mr. Ayala did not seek to postpone the proceedings until DNA results were finished. *See TR II* at 82-83; *RP* at 24-45.

*Id*.

### iii. The Plea

The first communication that Tovar had with Mr. Ayala was on the telephone while he was incarcerated. *TR I* at 22, 155-57. During this five or six minute telephone conversation, Mr. Ayala explained to Tovar that his sister had hired him, that he had special influence to call the jail, that he was friends with Judge Murdoch, and that he made deals with Judge Murdoch. *Id*.; *see also Docs. 23, 38*.

On March 25, 2003, Tovar first met Mr. Ayala before the first plea hearing in a small room next to the courtroom. *See TR I* at 23-24, 158-59. His sister and mother were present at this meeting. *Id*. At the meeting, Mr. Ayala again explained to Tovar that he was friends with Judge Murdoch and that, because of his influence with the judge, he was the only attorney that could meet in the room adjacent to the courtroom. *Id*. He also explained to Tovar that Judge Murdoch was in agreement with a three-year sentence. *TR I* at 159. As noted above, the plea hearing was continued because the assistant district attorney was not prepared to go forward without first consulting with his supervisor and Lilia. *See Doc. 91, Ex. 34*.

The second time Tovar met with Mr. Ayala was on April 14, 2003, directly before the second plea hearing. *TR I* at 160-61. During this meeting, Mr. Ayala spoke with Tovar while he was sitting in the jury box. *Id*. Mr. Ayala gave Tovar the plea agreement, which was in English, and instructed him to sign it for a three-year sentence.[8] *Id*.; *see also Doc 38.* Mr. Ayala did not translate the plea agreement, and did not explain to Tovar the significance of the plea agreement. *Id*. During the April 14th plea hearing, Mr. Ayala stood beside Tovar and instructed him as to

---

[8] Tovar is a native Spanish speaker and cannot read English. *TR I* at 146, 160, 178.

10

how to respond to each of Judge Murdoch's questions.[9]  *Id*. at 161-62.  Tovar went along with Mr. Ayala's instructions because of the supposed three-year agreement that Mr. Ayala had with Judge Murdoch.[10]  *Id*.

    iv.  Mr. Ayala's Investigation

Prior to the entry of the plea, Mr. Ayala had the following items: (i) two ninety minute interview tapes, and (ii) hospital records from September 4, 2002.  *See Doc. 91, Exs. 19, 29*.  Mr. Ayala never requested to interview Lilia or any of the State's other witnesses.[11]  *TR II* at 81, 149.  He never requested a speed letter to view the evidence in the Albuquerque Police Department's possession.  *Id*. at 81-82.  Mr. Ayala did not interview any of the potential defense witnesses suggested by Tovar, including his sister, his friends, and his co-workers, all of whom could have, among other things, described Tovar and Lilia's relationship during the summer and fall of 2002.  *TR II* at 81; *TR I* at 20, 47-48, 59-60, 148-49, 156-58.  There is also no evidence to suggest that Mr. Ayala interviewed Tovar's daughter, who would have provided information as to whether Tovar had a key to Lilia's house and whether Tovar spoke with his daughter during the October 8th incident.  *TR I* at 151, 154, 71.  Additionally, Mr. Ayala did not retain any experts or await for the results of the DNA tests before advising his client to enter a plea.  *TR II* at 83.

---

[9] At the April 14th plea hearing, all of Tovar's answers were "no" or "yes," except for a "that's fine."  *Doc. 91, Ex. 6*.

[10] In making the following findings, I note that I have reviewed the confidential letters sent to Tovar from the Disciplinary Board.  *See Doc. 108, Exs. 13-14*.  As to the statements that were purportedly made by Mr. Ayala, I find them to be unreliable and no substitute for Respondents' failure to produce evidence refuting the specifics of the sentence promise.  To the extent the letters are being providing for some other reason, I conclude that they are not relevant to my finding that Mr. Ayala provided ineffective assistance of counsel.

[11] On December 17, 2002, the State filed a Notice of Intent to Call Witnesses, which listed eight Albuquerque Police officers, Lilia, Veronica Moya, Mark Bruening, and two physicians from the University of New Mexico Hospital.  *See RP* at 17.

II.  Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

Under § 2254(d)(1), the phrase "clearly established federal law" refers to the "holdings, as opposed to the dicta" of the Supreme Court that set forth "the governing legal principle or principles . . . at the time the state court renders its decision."[12]  *Yarborough v. Alvarado,* 541 U.S. 652, 660-661 (2004) (internal quotations and citations omitted); *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).  A state decision is "contrary to" clearly established federal law if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if

---

[12]  The law is not clearly established if it announces "[a] rule that breaks new ground or imposes a new obligation on the States of the Federal Government." *Williams v. Taylor*, 529 U.S. 362, 381 (2000) (citations omitted).  As the Tenth Circuit recently explained:
> Thus, in the post-*Musladin* analysis, clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*.  Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the rule to that context. . . .  Second, *Musladin* clarified that the threshold determination that there is no clearly established federal law is analytically dispositive in the § 2254(d)(1) analysis.  That is, without clearly established federal law, a federal habeas court need not assess whether a state court's decision was 'contrary to' or involved an 'unreasonable application' of such law.

*House v. Hatch*, — F.3d —, 2008 WL 1947027 at *4 (10th Cir. May 6, 2008) (discussing *Carey v. Musladin*, 127 S.Ct. 649 (2006)).

"the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Court's] precedent."[13] *Gonzales v. Tafoya*, 515 F.3d 1097, 1109 (10th Cir. 2008) (quoting *Williams*, 529 U.S. at 405-06). "A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner."[14] *Brown v. Payton,* 544 U.S. 133, 141 (2005). Under § 2254(d)(2), a state decision rests on an "unreasonable determination of the facts" where a petitioner shows by "clear and convincing evidence" that the factual finding is erroneous. Otherwise, the factual findings are presumed correct. *See House*, 2008 WL 1947027 at *6; 28 U.S.C. § 2254(e)(1).

However, when the federal court evidentiary hearing provides material facts not considered by the state court, AEDPA's deferential review is not applicable. *See Bryan v. Mullin*, 335 F.3d 1207, 1215-16 & n. 7 (10th Cir. 2003) (citing *Miller v. Champion*, 161 F.3d 1249, 1254 (10th Cir. 1998) and declining to apply § 2254(d) and (e)'s deferential standard of review when the state court had denied an evidentiary hearing on ineffectiveness claims and federal district court had conducted one); *Mayes v. Gibson*, 210 F.3d 1284, 1289 (10th Cir. 2000) (reviewing additional evidence proffered by habeas applicant without deference to the state court's factual findings when state court denied an evidentiary hearing). "After all, when new

---

[13] It is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be "diametrically different" and "mutually opposed" to the Supreme Court decision itself. *Gonzales*, 515 F.3d at 1109 (quoting *Williams*, 529 U.S. at 405).

[14] "It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court" applied "clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76 (internal quotations and citations omitted). "Rather, that application must be objectively unreasonable." *Id.* at 76.

evidence is produced during federal habeas proceedings, what the state court decided (the merits of a legal issue based on the factual record before it) is different from what the federal court must decide (the merits of the same legal issue but based on a materially different factual record)." *Torres v. Lytle*, 461 F.3d 1303, 1312 (10th Cir. 2006); *see also Young v. Simmons*, 486 F.3d 655, 663 (10th Cir. 2007) ("We do not apply AEDPA's deferential review standard when a federal district court holds an evidentiary hearing and considers new evidence that was not before the state court at the time it reached its decision, even if the state court resolved the claim on the merits.").

Here, then, AEDPA's deferential standard is not applicable. Under the pre-AEDPA standard, a federal habeas court can grant relief only if the error in state court "deprived [petitioner] of fundamental rights guaranteed by the Constitution of the United States." *See Brown v. Shanks*, 185 F.3d 1122, 1124 (10th Cir. 1999) (quoting *Jackson v. Shanks*, 143 F.3d 1313, 1317 (10th Cir.1998)). Legal issues are reviewed de novo, "affording deference to the state court's construction of state law." *Id*.

III.  Analysis

The United States Supreme Court's longstanding test for determining the validity of a plea is simply "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant."[15]  *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (citations omitted). The voluntariness of a plea can only be determined by considering "all of the relevant circumstances surrounding it." *Brady v. United States*, 397 U.S. 742, 749 (1970).

---

[15] Nolo contendere pleas in New Mexico amount to a confession of guilt and have the same legal consequences as a guilty plea. *See Thomas v. Kerby*, 44 F.3d 884, n.4 (10th Cir. 1995); *State v. Ball*, 718 P.2d 686, 693 (1986); *see also Rose v. Uniroyal Goodrich Tire Co.*, 219 F.3d 1216, 1219-1220 (10th Cir. 2000). Accordingly, for the purposes of these proceedings, I will treat Tovar's nolo contendere plea the same as a guilty plea.

"A guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void." *Machibroda v. United States*, 368 U.S. 487, 493 (1962). While statements made by a petitioner in open court carry a "strong presumption of verity" and constitute a "formidable barrier," that barrier is not "insurmountable." *Blackledge*, 431 U.S. at 74. As the Court explained in *Blackledge*:

> Particularly if, as Allison alleged, he was advised by counsel to conceal any plea bargain, his denial that any promises had been made might have been a courtroom ritual more sham than real. We thus cannot conclude that the allegations in Allison's habeas corpus petition, when measured against the 'record' of the arraignment, were so 'patently false or frivolous' as to warrant summary dismissal.

*Id.* at 78. A plea may be involuntary where an attorney materially misrepresents the consequences of the plea; however, standing alone, an attorney's erroneous sentence estimate does not render a plea involuntary. *See United States v. Silva*, 430 F.3d 1096, 1099 (10th Cir. 2005); *Laycock v. New Mexico,* 880 F.2d 1184, 1186 (10th Cir. 1989); *Lasiter v. Thomas*, 89 F.3d 699, 702-03 (10th Cir. 1996). When, as here, petitioner contends that his plea was involuntary as a result of ineffective assistance of counsel, the "two-part *Strickland v. Washington* test applies . . . ." *Hill*, 474 U.S. at 58.

To establish ineffective assistance of counsel, a habeas petitioner must satisfy a two-part test. First, he must show that counsel's performance fell below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Judicial scrutiny of counsel's performance is highly deferential; thus, the petitioner must overcome the presumption that the challenged action might be considered sound trial strategy. *Id.* at 689.

Second, the petitioner must show he has been prejudiced; that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. In order to satisfy the prejudice requirement, the defendant must show that there is a reasonable probability that he would have not pleaded guilty and insisted on going to trial. *See Hill*, 474 U.S. at 59. As the Court explained in *Hill*:

> In many guilty plea cases, the 'prejudice' inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

*Id*. at 59. Because the *Strickland* test is two pronged, if either prong is not met, it is unnecessary to discuss the other. *Id*. at 60.

Turning to plea claim, under *Strickland's* first prong, I find that Mr. Ayala's performance fell below an objective standard of reasonableness. Mr. Ayala's errors were so serious that he was clearly not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Among other things, Mr. Ayala failed to explain the significance of the plea agreement and recklessly promised Tovar that he had an agreement with Judge Murdoch for a three-year sentence. This three-year sentence was not a predication, probability, or an estimate, but rather, a promise that constituted a materially misrepresentation as to the consequences of the plea. *See Silva*, 430 F.3d at 1099.

In so finding, I note that Tovar has overcome the formidable barrier put in place by his

statements at the April 14th plea hearing. Tovar's testimony regarding the sentence promise was detailed and specific. I find his account to be credible. For example, he provided the Court with specifics as to when Mr. Ayala informed him about the three-year sentence, the terms of the promise, and whom the promise was between. *See TR I* at 158-162. He also provided ample reasons as to why he believed Mr. Ayala and why he answered as Mr. Ayala instructed him to at the plea hearing. *Id*. Besides reliance on the plea hearing transcript, Respondents did not put on any evidence that would refute the specifics of Mr. Ayala's sentence promise. The transcript from the April 14th plea hearing, for that matter, casts no real light on the sentence promise made by Mr. Ayala or Mr. Ayala's instructions to Tovar on how to answer Judge Murdoch's inquires. Accordingly, I find that Mr. Ayala's performance fell below an objective standard of reasonableness and that Tovar's signature on the plea agreement and statements at the April 14th plea hearing were a "ritual more sham than real." *Blackledge*, 431 U.S. at 78.

Turning to the second prong under *Strickland*, I conclude that Tovar has sufficiently demonstrated that, but for Mr. Ayala's error, there is a reasonable probability that he would not have pleaded guilty and insisted on going to trial. Tovar testified and alleged in his habeas petition that, but for the three-year sentence promise, he would have insisted on going to trial. Further, at the evidentiary hearing, he produced evidence that suggests he did not rape his ex-wife. In objectively considering the totality of this evidence, I conclude that Tovar has made a showing that, if he had rejected the State's plea offer, the outcome of the proceedings "likely would have changed." *Hill*, 474 U.S. at 59. Said another way, it is likely that a jury would have acquitted Tovar of the two rape charges.

The available evidence supports this conclusion. During the summer and fall of 2002, Tovar and Lilia had an ongoing intimate relationship. Lilia delayed reporting both of the alleged

17

sexual assaults.  As for the September charge, Lilia delayed reporting the rape to prosecutors for several months and did not file a police report.  As for the October charge, Lilia delayed reporting the rape to prosecutors until the day of the grand jury proceedings and both the police report and the medical records make no mention of a rape.  Further, the medical records from the September incident do not indicate trauma or injury to any part of Lilia's body.  In addition, the back seat of the car, where the October rape allegedly took place, is absent of any blood.  While DNA results did not exclude Tovar as a donor, in a relationship such as this, DNA evidence is far from dispositive.[16]  Moreover, as to both rape charges, it is likely that a jury would find Tovar's testimony to be credible, as he admitted to battering his ex-wife, but consistently denied raping her.  Thus, I conclude it is likely that a reasonable jury would have acquitted Tovar on both the rape charges and that Tovar was prejudiced by Mr. Ayala's ineffectiveness.

Similarly, I also conclude that Tovar's plea was involuntary as a result of Mr. Ayala's failure to investigate.  The voluntariness of the plea depends on whether counsel's advise "was within the range of competence demanded of attorneys in criminal cases."  *Hill*, 474 U.S. at 56. "The duty to investigate derives from counsel's basic function . . . to make the adversarial testing process work in a particular case."  *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997). Counsel has a duty to investigate all reasonable lines of defense or make reasonable

---

[16] At the evidentiary hearing, Respondents' DNA expert testified as follows:
>Q:  If you want to know when something happened you don't use DNA to figure out when something happened, do you?
>A: No.
>Q: Certainly not where, that is not even an issue with DNA?
>A: No. . . .
>Q: The question is, DNA doesn't answer anything about why, for example, whether ejaculate ended up on a back seat via consent or via rape, does it?
>A: No.

*TR II* at 108-09.

determinations that such investigation is not necessary. *See Strickland*, 466 U.S. at 691. A decision not to investigate must be directly assessed for "'reasonableness in all the circumstances.'" *Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (quoting *Strickland*, 466 U.S. at 691).

As set forth above, prior to the entry of the plea, Mr. Ayala had the following items: (i) two ninety minute interview tapes, and (ii) hospital records from September 4, 2002. Aside from presumably reviewing this evidence, the record reveals that Mr. Ayala conducted no additional investigation. Clearly, then, this is not a situation where Mr. Ayala conducted a sufficient investigation prior to advising his client to enter a plea. Thus, it must be determined whether "reasonable professional judgments support the limitations on [Mr. Ayala's] investigation." *Strickland*, 466 U.S. at 690-91.

Here, Mr. Ayala's decision to end his investigation was not consist with professional standards. Armed with the evidence that Mr. Ayala had, a competent attorney would have continued to investigate the rape charges. At a minimum, this would include interviewing witnesses, following evidentiary leads provided by his client, and reviewing available evidence in the case. This never happened. Instead, the record reveals that Mr. Ayala's only interest was in disposing the case as quickly as possible by way of a plea. Such inattention on the part of Mr. Ayala fell below an objective standard of reasonableness under *Strickland's* first prong.

Moving to the prejudice prong, I conclude that the mitigating evidence counsel failed to discover was powerful. Mr. Ayala's failure to entertain this evidence, the viability of a defense, and discuss the matter with his client, ensured that Tovar was unable to make an intelligent choice of whether to accept a plea or go to trial. Had all of these things happened, it is likely that Tovar would have elected to go to trial. In addition, as established above, in objectively

considering the totality of the evidence, it is likely that a jury would have acquitted Tovar of the two rape charges.

Wherefore, it is hereby recommended that Tovar's Application for Writ of Habeas Corpus be granted subject to the condition that the State of New Mexico retry or release Tovar within a reasonable period of time.[17]

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the ten day period if that party wants to have appellate review of the Proposed Findings and Recommended disposition.  If no objections are filed, no appellate review will be allowed.**

_____
UNITED STATES MAGISTRATE JUDGE

---

[17] *See Fisher v. Gibson*, 282 F.3d 1283, 1311 (10th Cir. 2002); *Osborn v. Shillinger*, 861 F.2d 612, 630-31 (10th Cir. 1998).